**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

EILEEN C. HOLDER,

        Plaintiff,

v.                                    No. CIV 07-774 LFG

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

    Plaintiff Eileen C. Holder ("Holder"), invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Holder was not eligible for disability insurance benefits ("DIB").[1] Holder moves this Court for an order reversing the Commissioner's final decision and remanding for a new hearing. [Doc. 14.]

## Background

    Holder was born on March 22, 1960, and was 46 years old when the administrative law hearing was held on October 18, 2006. [Tr. 73, 529.] On June 22, 2004, Holder applied for DIB, alleging an onset of disability on December 1, 2001. [Tr. 73.] She asserts she no longer is able to work due to depression, anxiety attacks, asthma, chronic obstructive pulmonary disease ("COPD"),

---

[1]At the Administrative Law Hearing, it was explained that Holder's husband works and makes too much money for her to have applied for supplemental security income ("SSI") benefits. [Tr. 555.]

1

bronchitis, fibromyalgia, and chronic pain.  [Tr.  64, 109, 537, 539, 541, 545, 546, 548, 549.]  In addition to Holder's many alleged ailments, her weight fluctuated from 215 pounds to over 330 pounds.  [Tr. 321.]  She is almost six feet tall.  [Tr. 540-41.]  Holder has had an extensive history of prescription drug addiction, including suicide attempts and hospitalizations.

At times, Holder reported that she had 13 years of formal education and one month of technical instruction.  At the administrative law hearing, she indicated she had 12 years of education along with several college semesters.  [Tr. 162, 216, 538.]  Holder worked part-time as a baker at her sisters' business in 2002 and 2003, but she stopped due to her medical conditions.  [Tr. 65-66.]  This work did not constitute substantial gainful activity.  [Tr. 21.]  She drove a truck from 1999 through 2001 for different trucking companies, and during some of her employment as a truck driver, she supervised drivers.  [Tr. 84-85.]  Holder's past relevant work history is as a truck driver.

Holder lives with her husband.  She has three children, most of whom are grown.  In 2001, Holder's daughter was 16 years old and had been diagnosed with bipolar disorder.  The daughter was prescribed Lithium but did not follow up with treatment.  [Tr. 295.]  One of Holder's sons was 12 years old then and had been diagnosed with hyperactivity.  [Tr. 295.]

On October 18, 2006, Administrative Law Judge ("ALJ") George W. Reyes held a hearing, during which Holder was present and represented by a non-attorney.  [Tr. 28, 529.]  In a decision, dated December 9, 2006, Judge Reyes found that Holder was not disabled from December 1, 2001 through the date of the decision.  [Tr. 26.]  Thus, Holder was not eligible for DIB.  On June 16, 2007, after considering additional evidence or argument presented by Holder, the Appeals Council denied Holder's request for review [Tr. 4, 7, 11.]  This appeal followed.

## <u>Standards for Determining Disability</u>

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[8] age, education and past work experience, she is capable of performing other work.[9]

At step five, the ALJ can meet his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (relying on Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

In this case, the ALJ used the grids in reaching his decision at step five of the analysis and did not utilize a vocational expert.

**Standard of Review**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v.

---

[8]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After reviewing all of the evidence and denying Holder's application, the ALJ made the following findings: (1) Holder met the insured status requirements of the SSA through December 31, 2007; (2) she was not engaged in substantial gainful activity during the pertinent time frame; (3) Holder had severe impairments of: "fibromyalgia, chronic back pain, chronic obstructive pulmonary disease, and prescription drug abuse," but her impairments of "anxiety, depression, hypertension, hypothyroidism, a history of bilateral carpal tunnel syndrome status post surgical release, and a history of a lateral meniscus tear of the right knee status post arthroscopic repair" were not severe, considered separately, or in combination with any other impairments; (4) Holder's impairments did not meet listing requirements; (5) she had the RFC to perform light exertional level work, but was unable to perform her prior relevant work as a truck driver; (6) she was 41 years old at the alleged disability onset date and 46 years old at the time of the hearing; (7) Holder had at least a high school education; (8) transferability of job skills was not material to the determination of disability; (9) based on Holder's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that she could perform; and (10) the Medical Vocational Rules (grids) directed a finding of non-disability. [Tr. 19-26.]  While it appears that the ALJ intended to insert the applicable grid number upon which he was relying, none appears in the decision, and the sentence ends without a period.  [Tr. 26.]

In this appeal, Holder argues that:  (1) the ALJ's step two decision that Holder did not suffer from "severe" depression was not supported by substantial evidence; (2) the ALJ failed to evaluate Holder's obesity in accordance with social security rulings; (3) the ALJ's step five findings were unsupported by substantial evidence where the ALJ failed to state which grid rule he applied in relation to the non-disability finding; and (4) the ALJ's step five findings are unsupported by

substantial evidence because the ALJ cannot rely exclusively on the grids where the claimant suffers from exertional and nonexertional impairments.  [Doc. 15.]

Respondent argues that substantial evidence supports the Agency's final decision which is consistent with applicable law.  Thus, according to Respondent, the ALJ's decision should be affirmed.  [Doc. 16.]

**Summary of Holder's Medical Records**

Holder's medical records are voluminous.  They are notable for the number of diagnoses made, the number of medical problems alleged, and the number of medications Holder was taking. In particular, the records are noteworthy due to the number of times Holder sought and received prescriptions and re-fills for narcotic pain killers and other medications, notwithstanding documentation in her medical record of her history of prescription narcotic medication abuse. Medical records are provided for Holder from 1995 through 2007.[11]

**1995**

It appears that a Physician's Assistant in Farmington, New Mexico provided most of the medical care to Holder in 1995.  Holder made frequent trips to the medical provider, sometimes weekly, twice a month, or monthly.  The 1995 records note that Holder was a long term smoker, but that she was attempting to stop smoking.  Based on all the years of medical records, it is clear that Holder continued to smoke even though she stated she had quit.  This was true, notwithstanding hospitalizations for COPD and asthma-related conditions.

---

[11]It is unknown why there are so few medical records from 1996, based on Holder's extensive medical treatment before and after that year.

In January 1995, Holder complained of chronic back pain and was prescribed what already was or what became her drug regimen for some years: Lortab[12] and Soma.[13] Holder was prescribed 30 tablets of Lortab and 40 of Soma. [Tr. 417.] She was given a prescription to quit smoking in January 1995. She was to do some gradual exercising. She weighed 256 pounds in January 1995. [Tr. 417.] On February 2, 1995, her prescriptions were refilled. Five days later, on February 7, 1995, prescriptions for Soma (40) and Lortab (30) were called into the pharmacy. On February 14, 1995, a week later, the prescriptions were refilled. She was given Motrin at 800 mg. [Tr. 408.] The pharmacy, on February 20, 1995, refused to fill the prescription for Lortab and Soma because it was too early. [Tr. 408.] Nonetheless, on February 21, 1995, Holder again obtained refills of Lortab and Soma. She complained of sinus problems and headaches. [Tr. 416.]

On March 13, 1995, prescription refills were called in again for Soma and Lortab. [Tr. 416.] The same is true for March 17, 1995, when Holder complained of elbow pain. [Tr. 416.] On April 4, 1995, Holder complained of congestion, headaches and heart spasms. Her prescription for Soma was increased to 100. Lortab was filled at 40. [Tr. 415.] On April 20, 1995, Holder complained again of elbow pain and was referred to an orthopedist. She was given prescriptions for Lortab, Soma, Prozac and Motrin. [Tr. 407.] On April 21, 1995, Holder received a cortisone injection for tendinitis. [Tr. 439.]

---

[12]The generic is Hydrocodone. Hydrocodone is in a group of drugs called narcotic pain relievers. Hydrocodone may be habit-forming and should be used only by the person it was prescribed for.  www.drugs.com

[13]"This medication is used to treat pain and discomfort from muscle injuries such as strains, sprains, and spasms. It is usually used along with rest, physical therapy, and other treatments (e.g., anti-inflammatory medication). . . . This medication may cause dependence, especially if it has been used regularly for an extended time or if it has been used in high doses. In such cases, withdrawal reactions (e.g., stomach cramps, trouble sleeping, headache, nausea) may occur if you suddenly stop this drug. . . .Though it is very unlikely to occur, this medication can also result in abnormal drug-seeking behavior (addiction/habit-forming). Do not increase your dose, take it more frequently or use it for a longer time than prescribed."  www.webmd.com

On May 18, 1995, Holder complained of sinusitis.  She was given prescriptions for Claritin, Lortab and Soma.  [Tr. 406.]  On May 30, 1995, she complained that she suffered from headaches continuously.  Soma helped her a little, she said.  She was taking 3-4 pills of Soma per day and 1-2 tablets of Lortab.  [Tr. 414.]  On May 30, 1995, Holder complained of headaches.  A CT scan of her head was scheduled.  It appears, although it is not entirely clear, that she refilled her prescriptions. [Tr. 405.]

The CT scan of her head was normal.  [Tr. 431.]  On June 7, 1995, she complained of headaches and depression.  She was to continue on her medications.  [Tr. 404.]  On June 30, 1995, her prescriptions were refilled.  She reported that she felt good on 40 mg. of Prozac but complained of chronic pain and depression.  The refills were for Lortab (50) and Soma (100).

On July 18, 1995, Holder wanted to talk to the doctor about losing weight.  She complained of chronic pain.  On August 3, 1995, her prescriptions were refilled as usual, and were refilled just a week later on August 11, 1995.  [Tr. 413.]  On August 22, 1995, the prescriptions were again refilled.  She complained of depression, hypertension (HTN) and back pain.  [Tr. 412.]

On September 21, 1995, Holder reported a sore throat and aching for a day.  It is not clear if Lortab and Soma were refilled, but possibly.  [Tr. 411.]  On October 5, 1995, Holder needed refills of Lortab and Soma which were given.  [Tr. 402.]  It is unclear, but appears that they may have been refilled again on October 19, 1995.  On December 18, 1995, Dr. Marie Rousseau, a physician in Farmington, N.M., refilled the prescriptions for Lortab, Soma and Prozac.  [Tr. 400.]

**1996**

There is only one medical record from 1996 that indicates Dr. Rousseau refilled the prescriptions of Ibuprofen, Lortab (50), and Soma (100).  [Tr. 400.]  It is unclear why there are no additional medical records from 1996.  Based on notations from 1997, it seems clear that Holder was seen regularly in 1996.

**1997**

Most of the medical records from 1997 were signed by Dr. Rousseau, and most contain very few notations, with respect to any examination of Holder.  The 1997 medical records begin in July for some reason.  On July 16, 1997, Holder was seen at the Life Course Care Center for pain to her ribs.  She was given Naproxen[14] "et Lortab".  [Tr. 442.]  On July 29, 1997, the medical record indicates Holder had two fractured ribs on either side caused by coughing or sneezing.  [Tr. 399, 441.]  She needed prescriptions for Prozac, Monopril,[15] Lasix,[16] Thyroxine,[17] Lortab, Soma and Trazadone.[18]  The record further states that Holder "only takes Lortab and Soma at night.  She was given refills of 50 each.  [Tr. 399.]

---

[14]"Naproxen is used to relieve pain and swelling (inflammation) from various conditions. It is used to treat headaches, muscle aches, backaches, tendonitis, dental pain, and menstrual cramps. It also reduces pain, swelling, and joint stiffness caused by arthritis, bursitis, and gout attacks."  www.webmd.com

[15]"This drug belongs to a group of medications called ACE inhibitors. It is used to treat high blood pressure (hypertension)."  www.webmd.com

[16]"Furosemide is a "water pill" (diuretic) that increases the amount of urine you make, which causes your body to get rid of excess water. This drug is used to treat high blood pressure."  www.webmd.com

[17]Used to treat thyroid conditions.  "An iodine-containing hormone, C15H11I4NO4, produced by the thyroid gland, that increases the rate of cell metabolism and regulates growth and that is made synthetically for treatment of thyroid disorders."  www.thefreedictionary.com

[18]This medication is used to treat depression. Trazadone works by helping to restore the balance of a certain natural chemical (serotonin) in the brain.  www.webmd.com

On August 4, 1997, there is a medical report from San Juan Regional Medical Center (SJRMC). It states that morbid obesity is a problem but that the fibromyalgia and HTN are controlled with medications. Holder was taking an anti-depressant, along with Lortab, Soma and Trazadone. There was no evidence of bone disease on the films. However, there was a rib fracture. [Tr. 444.]

On August 11, 1997, Dr. Rousseau refilled the prescriptions. [Tr. 398.] On August 26, 1997, Dr. Rousseau again refilled the prescriptions. Holder was feeling well but complained of arthritis. She was given Naproxen, Lortab, Monopril, and Soma. [Tr. 398.]

On September 2, 1997, Holder was seen at the hospital in Farmington. [Tr. 443, 452.] The final diagnosis was "substance ingestion." [Tr. 443.] Holder's husband brought her in for an evaluation of "decreased sensorium." Holder was oriented as to person, place and day but unable to speak that day. Her husband had to give most of the history as Holder was unable to provide a clear history due to being "obtunded.[19]" [Tr. 452.]

The record notes that Holder's history was "fairly involved" and that she "apparently had problems with drugs for several years." The record indicates Holder had gone to multiple medical providers to get different drugs, such as anti-depressants, muscle relaxers, and narcotics like Soma and Fiorinal.[20] She had had diagnoses of hypothyroidism and depression. She suffered back pain and got migraines. She tended to "hoard her pills" and then take a lot of them to get some kind of

---

[19]Obtund is defined as "to render dull or blunt; to render less acute." Dorland's Illustrated Medical Dictionary, 26th Ed.

[20]"This combination medication is used to treat tension headaches. Aspirin helps to decrease the pain from the headache. Caffeine helps increase the effects of aspirin. Butalbital is a sedative that helps to decrease anxiety and cause sleepiness and relaxation." www.webmd.com

euphoria or relief.   Given the numbers of pills prescribed and the frequency of refills, it was clear that she was greatly exceeding the prescribed dosage.

On that date, Holder's husband brought in empty bottles of Fiorinal and Soma.  The Fiorinal was Holder's daughter's prescription.  The medical provider noted that drug abuse was a chronic problem and that some intervention was necessary.  Holder needed formal psychiatric evaluation regarding her depression and the possible presence of a personality disorder.  She was admitted for "crisis observation" that night.  [Tr. 452.]

On September 9, 1997, however, there is a medical record from Dr. Rousseau stating that Holder had "lost script".  Her prescriptions for Prozac, Trazadone, Lortab and Soma were refilled. [Tr. 397.] She complained of sinus trouble and aching on September 25, 1997, and her prescriptions appear to have been refilled.  [Tr. 397.] On October 13, 1997, Dr. Rousseau refilled the prescriptions for Lortab and Soma.  [Tr. 396.]  On October 27, 1997, Holder was still feeling sick.  She received a Z-pack antibiotic and appeared to get refills for the usual medications.  [Tr. 396.]

On November 19, 1997, she got refills for Lortab and Soma.  [Tr. 395.]  The same is true for November 24, 1997, but the quantities for each medication were increased to 100 pills.  [Tr. 395.] On December 16, 1997, Dr. Rousseau again refilled the prescriptions for Lortab and Soma at 100 pills each.  [Tr. 395.]

**1998**

Holder saw Dr. Rousseau very regularly in 1998 as well.  She had her prescriptions refilled either twice a month or monthly.  [Tr. 389, 390, 391, 392, 394, 395, etc.]  She was referred for physical therapy related to back pain and spasms.  [Tr. 435.]  But, Holder never complied with

physical therapy referrals, other than to attend a few times, and complain that therapy made her feel worse.  [Tr. 457.]  She thought physical therapy was "hocus pocus."  [Tr. 194.]

On June 15, 1998, Dr. Rousseau filled out a form assessing Holder's physical condition related to her truck driving position.  Dr. Rousseau stated on the form that Holder had fibromyalgia and took Lortab and Soma.  Holder's weight then was 275 pounds, but her appearance and development were marked as "good."  This form seemed to clear Holder for driving.  [Tr. 430.]  On another form that is undated, Dr. Rousseau wrote that Holder was taking Lortab and Soma for fibromyalgia.[21]  [Tr. 433-34.]

On July 13, 1998, Holder told Dr. Rousseau that she had lost her Lortab and Soma and gone off Prozac and Trazadone.  She stated that her new truck driving job did not allow medications to be used during driving.  Thus, she quit the anti-depressant type medications.  However, she still was taking Lortab and Soma.  [Tr. 391.]

In the summer, fall and winter of 1998, Dr. Rousseau continued to refill the same prescriptions for Holder.  [Tr. 387, 388, 389, 390.]

**1999**

The records from 1999 are very similar to those in 1998 – many visits to Dr. Rousseau for the same refills of medications.  Holder was taking Trazadone, Lortab, Soma and Phenergan.[22]  The

---

[21]While there are multiple references to fibromyalgia in the record, no objective medical evidence was presented to show a diagnosis of fibromyalgia or testing that confirmed the condition.  Holder consistently reported that she had been diagnosed with the condition years ago.

[22]"Promethazine is used to prevent and treat nausea and vomiting related to certain conditions (e.g., motion sickness, before/after surgery). It is also used to treat allergic symptoms such as rash, itching, and runny nose. It may be used for a short time to treat a runny nose due to the common cold. It may also be used to help you feel calmer before/after surgery or to help certain narcotic pain relievers (e.g., meperidine) work better." www.webmd.com

prescriptions for Lortab and Soma were usually refilled at 100 pills each.  She saw Dr. Rousseau twice a month or monthly.  [Tr. 381, 382, 383, 384, 385, 386, 387.]  In October 1999, another medical provider's note described discussions with Holder about smoking cessation and exercise. [Tr. 382.]

### 2000

On January 20, 2000, Holder was given refills for chronic back pain.  Lortab and Soma were prescribed at 120 pills each.  [Tr. 134.]  On February 11, 2000, she received refills again.  The note states she had gone back to work.  [Tr. 133.]  On March 6, 2000, Holder complained of an ear ache and chronic back pain.  She was on Lortab, Soma and Amoxicillin.  She weighed 258 pounds.  [Tr. 133.]  A March 28, 2000 record notes that Holder was there a "week early for meds."  She complained of stabbing pain in her left ear.  She was working as a truck driver in Dulce.  [Tr. 132.] On April 24, 2000, Dr. Rousseau refilled the prescriptions of Lortab, Soma and Promethazine (Phenergan).  [Tr. 132.]  There is a medical record dated May 15, 2000 that appears to reflect a physical examination by Rousseau.  It is very cursory.  Holder's weight was 266 pounds. Her general appearance and development were described as "good."  No psychiatric disorders were checked.  [Tr. 130, 131.]

The same prescriptions were refilled during 2000.  [Tr. 127, 128, 129, 130.]  Holder continued to complain of back pain.  On one date, she stated that her husband had used some of her pills.  [Tr. 127.]

**2001**

Holder continued to get the same prescriptions refilled regularly. [Tr. 123, 124, 125, 126.] She was also prescribed Ativan[23] on March 19, 2001 by Dr. Rousseau. She continued to receive prescriptions for Ativan, along with Lortab and Soma. [Tr. 122, 123, 124, 125.]

December 2001 is the onset of Holder's disabilities. She stopped working then because of excruciating pain. She was unable to get into or out of the truck at work. She had slipped into depression and continued to have chronic complaints of muscle pain caused by fibromyalgia. [*See* Tr. 23.]

On December 14, 2001, Dr. Rousseau prescribed Lortab, Soma, Ativan, Trazadone and Phenergan. [Tr. 121.] On December 25, 2001, Holder was admitted to the hospital again in Farmington for an overdose of narcotic pain pills, muscle relaxers and anti-depressants. [Tr. 24, 309.] She had slept two days at home before her family took her to the hospital. [Tr. 24.] The admitting notes indicate ETOH (alcohol) and that Holder smoked one to two packs of cigarettes daily. [Tr. 297.]

Dr. Rousseau's December 26, 2001 notes states that Holder was prescribed Lortab from Rousseau's office but apparently Holder was getting Lortab and Soma from the Internet as well. According to Rousseau, Holder had been using Lortab, Soma and Ativan over many years for chronic back pain. [Tr. 298.]

The hospital notes indicate that Dr. Rousseau admitted Holder following the overdose of Ativan, Phenergan, Lortab, Trazadone and Soma. Holder admitted to taking an overdose, stating that

---

[23]"This medication is used to treat anxiety. Lorazepam belongs to a class of drugs known as benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect." www.webmd.com

she felt her family would be better off without her because of her ongoing drug addiction.  [Tr. 295.]

Holder reported abuse of Soma and Lortab and also stated the Internet provided easy access for her

supply of prescription drugs.  Holder self medicated with Soma and Lortab which appeared to

counteract her anxiety, agitation, and hyperactivity.  She reported having taken two prior overdoses

in her life and stated she had suffered from depression since she was 20 years old.  Holder's more

recent overdose was two years ago and the other, eighteen years ago.  This medical record indicates

that Holder's 16 year old daughter was diagnosed with bipolar disorder and prescribed Lithium but

had not followed up for treatment.  Her 12 year-old son was hyperactive.  Dr. Lund, at SJRMC,

described Holder as primarily using drugs in the winter time to combat sluggishness, and in the

summer, to calm herself down and sleep.  She was diagnosed with Bipolar II disorder, depression,

drug dependence of Soma and Lortab with Ativan abuse.  Dr. Lund wished to rule out a personality

disorder.  He further noted that the diagnosis of fibromyalgia was "by history" only.  Holder's GAF

on this date was 39.[24]  [Tr. 296.]  She was agreeable to inpatient treatment.

On December 30, 2001, Holder was discharged.  The discharge notes indicate that her

addiction to drugs was "quite apparent."  [Tr. 309.]  She was depressed but able to "contract" for

safety upon discharge.  Holder was given prescriptions of Neurontin, Wellbutrin,[25] Trazadone and

---

[24]"Standing alone, a low GAF does not necessarily evidence an impairment seriously interfering with a claimant's ability to work. . . . A GAF score of 50 or less, however, does suggest an inability to keep a job."  Lee v. Barnhart, 117 F. App'x 674, 678 (10th Cir. Dec. 8, 2004) (internal citation omitted).

[25]"Bupropion is used to treat depression. It can improve your mood and feelings of well-being. It may work by helping to restore the balance of certain natural chemicals (neurotransmitters) in your brain." www.webmd.com

Seroquel.[26]  She was to receive follow-up care at Family Crisis Center with medical management at Dr. Lund's office or with Dr. Rousseau.  [Tr. 310, 458.]

### 2002

On January 21, 2002, Holder was seen at the Community Counseling Center through Presbyterian Medical Services in Farmington.  [Tr. 161.]  This record notes that she currently had no primary care physician.  [Tr. 161.]  Holder reported that she had not taken Soma and Lortab for her chronic pain since her December 26, 2001 hospitalization.  The medical record notes that Holder had an intestinal bypass procedure in 1978 which was reversed in 1991.  She had had her stomach stapled but remained "extremely obese."  [Tr. 162.]  She loved working as a truck driver.  She admitted to using the following substances in the past 30 days: "alcohol, barbituates, opiates, other sed/hyp/trans."  During her lifetime, Holder admitted to using alcohol for 23 years, alcohol "to intoxication" for 23 years, amphetamines for 6 years, barbituates for 10 years, cocaine for 2 years, opiates and analgesics for 10 years and other sedatives for 2 years.  She had mixed substances on three of the past 30 days and over a period of 10 years.  She had never been treated for alcohol or drub abuse.  [Tr. 162-63.]  She admitted to a considerable need for drug treatment.  Holder had been charged with a parole violation on one occasion and with some other charges two other times.  [Tr. 163.]  Two of the charges resulted in convictions, including a DWI.  She had been charged with 5 major driving violations. [Tr. 163-66.]

---

[26]"This medication is used with or without other medications to treat certain mental/mood conditions (e.g., bipolar disorder, schizophrenia). Quetiapine is known as an anti-psychotic drug (atypical type). It works by helping to restore the balance of certain natural chemicals (neurotransmitters) in the brain."  www.webmd.com

On January 29, 2002, Holder was given refills for Neurontin, Wellbutrin and Trazadone. The note indicates she was "new to this pharmacy." [Tr. 160.] A diagnosis of bipolar disorder was noted.. She had a history of overdosing on controlled substances. [Tr. 160.]

On February 26, 2002, Holder was seen at Presbyterian. She still was smoking one pack of cigarettes daily. She weighed over 276 pounds. She complained of back and shoulder pain. Holder stated that she had been "clean" for two months and was not craving narcotics. [Tr. 159.] The month of January 2002 apparently marked the end of Holder's counseling for drug abuse. *See* Dec. 8, 2002 Presbyterian Medical Record (behavioral health discharge summary stating that Holder presented with an affective disorder and was seen between January 2 and January 28, 2002. She had either moved since then or they lost contact with her). [Tr. 156.]

On May 18, 2002, Holder complained of pain and was given trigger point injections. [Tr. 158.]

On August 4, 2002, Holder was seen at the Life Course Immediate Care Center. [Tr. 157.] She complained of back and shoulder pain, and fibromyalgia. She was prescribed Flexoril.[27] On August 8, 2002, Holder was seen at the Mesa Family Medical Center. Holder weighed 289 pounds. The record notes a long history of chronic pain and drug abuse, including the use of Lortab and Soma for 10 years. She was prescribed Lodine[28] (90). [Tr. 154.]

On August 14, 2002, Holder started physical therapy at Health South. The note indicates she worked as a truck driver but was unemployed. She reported that she had been given diagnoses of

---

[27]"This medication relaxes muscles. It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries." www.webmd.com

[28]"Etodolac is used to relieve pain from various conditions. It also reduces pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID)." www.webmd.com

fibromyalgia and degenerative joint disease nine years ago and had not been pain free for five years. [Tr. 148.]  She attended a few sessions of physical therapy before stopping in late August 2002.  [Tr. 135, 138, 139, 140, 142, 144, 146.]

Holder was apparently working part-time as a baker around September 2002.  [Tr. 25.]

On December 5, 2002, she was seen again at Mesa Family Medical Center.  The physical therapy had not helped the pain in her right shoulder and had actually added to the pain.  The use of a TENS unit was the best relief she had found for back pain.  She was referred to orthopedics.  [Tr. 152.]  She was also prescribed Ultracet[29] (30) and Flexoril (30).  [Tr. 152.]

An x-ray of her shoulder on December 5, 2002 indicated type II acromion with a little thickening as well as a small spur.  [Tr. 197.]  She denied any injuries to her shoulder and reported she had been told in the past by Dr. Chiodo (no records) that she suffered from fibromyalgia.  [Tr. 198.]  The examination revealed full range of motion in the shoulder, no popping, grinding or impingement.  It was very tender over the mid-trapezius muscle.  She was to try cortisone injections into the shoulder.  [Tr. 198.]

**2003**

In 2003, Holder was primarily seen by Orthopedic Associates or Pinon Family Practice ("Pinon").  She was seen regularly.  She was being given injections to her shoulder and obtained refills for Ultracet and Flexoril.  [Tr. 177, 195, 196.]  She was referred again for physical therapy and attended a few sessions before stopping.  [Tr. 173, 174, 175.]  She did not want to continue with physical therapy and reported that the only help she got from pain were the injections.  She also

---

[29]"This combination medication is used to treat short-term pain (5 days or fewer). Acetaminophen works by blocking or reducing the feeling of pain. It can also reduce a fever."  www.webmd.com

wanted to continue with Flexoril and Ultracet. The physician's assistant found this reasonable. [Tr. 194.]

On April 8, 2003, the Orthopedic note indicates that Flexoril was very helpful. The note also states that Holder had bilateral carpal tunnel syndrome (CTS). She was fit with a "cock-up" wrist splint which she was to wear at night. She was going to continue working at the bakery. [Tr. 193.] She received a refill of Flexoril on April 16, 2003. [Tr. 193.]

On May 8, 2003, Holder was complaining about the CTS. It was waking her up at night and she had to remove the splints. [Tr. 192.] There is a record dated May 23, 2003 from Four Corners Physical Therapy showing Holder was discharged from therapy. The prognosis was poor secondary to Holder's response to treatment. [Tr. 171.]

On May 27, 2003, Holder wanted more Flexoril and Ultracet. The Physician's Assistant stated she took too much already. [Tr. 192.]

On May 30, 2003, Holder was seen at NeuroDiagnostics by Dr. Breeden. She complained of numbness in her hands. The test results were abnormal indicating she had bilateral CTS and moderate compression. Dr. Breeden recommended management with non-steroidal anti-inflammatory medications and a wrist splint. But, she reported she had tried this without significant relief and would probably need surgery. [Tr. 181.]

On June 3, 2003, she was given a refill of Ultracet and Flexoril but no further refills were authorized. A June 17, 2003 record states that Holder has had "high doses of Ultracet and Flexoril for muscle spasms." The medical provider advised her that this was not a situation he would continue prescribing medications for and that in the long-term, she would not be obtaining those medications from that office. She was agreeable. [Tr. 190.]

On June 18, 2003, the carpal tunnel release procedure was performed.  [Tr. 183, 328.]  Holder was given Percocet "one time only" post-surgery.  [Tr. 189.]  The numbness in her fingers was resolving well by June 23.  [Tr. 188.]  And, the pain in her wrist, elbow and shoulder was resolving.  [Tr. 188, 327.]

On July 7, 2003, Holder was seen at Pinon.  [Tr. 269.]  She complained of a history of fibromyalgia, neck pain and inability to sleep.  She had been diagnosed with fibromyalgia nine years ago, but the pain increased recently.  Her left shoulder was sore too.  She reported that she had been off all narcotics from 2001 through 2002.  The medical records, however, belie that claim.[30]  A physician's assistant with Orthopedics Associates started her on Ultracet and Flexoril.  Holder used 120 Ultracets per month and 120 Flexerils per month.  She  was in pain every day and had tried medications that were not effective, including narcotics, Lodine, Voltaren, Prozac, Paxil and Neurontin.  She smoked a pack of cigarettes a day and had about 2 alcoholic drinks per week.  The medical provider was starting her on Atrovent and trying to get her to stop smoking.  She was given Voltaren and Ultracet (150), along with Flexoril (90).  She was to decrease the use of Flexoril and stated she was comfortable with this.  She was started on Effexor for depression and pain.

On July 8, 2003, she was seen by Orthopedic Associates and reported that her wrists were much better.  An unexpected benefit was that most of the pain in her elbow and shoulder was gone.  [Tr. 187, 326.]  She was cleared to return to light duty on July 21, 2003.  [Tr. 325.]

---

[30]Moreover, it can never be ascertained whether or not Holder continued to obtain narcotic painkillers from the Internet, since this was an avenue of easy access for her in 2001.

On August 1, 2003, Holder was seen at Pinon and given Ultracet (150) and Flexoril (90).  On August 22, 2003, she reported that the Voltaren was not helping but she was doing well on Effexor.  The Voltaren was switched to Vioxx.  Exercise was discussed with Holder.  [Tr. 264.]

On October 16, 2003, Holder reported that the Vioxx was helpful.  [Tr. 263.]  On October 29, 2003, she complained of back pain and that it hurt to walk.  She was given Percocet (30).  She was instructed to use Percocet or Ultram, but not both.  [Tr. 262.]  On November 12, 2003, she was advised to go to physical therapy but declined.  [Tr. 259, 261.]

On November 21, 2003, Holder complained of back pain and stated she was getting depressed secondary to pain. She refused physical therapy because therapy hurt more than it helped.  She was given home stretches and exercises and told they did not think her pain would improve without therapy.  Holder was to increase Effexor and decrease Percocet and "see how it goes."  [Tr. 259.]

**2004**

There are no medical records from early 2004.  On June 22, 2004, Holder filed for DIB benefits, claiming an onset date of December 1, 2001.  She was seen at Pinon on June 30, 2004 for a fever and pain in her joints and bones.  On June 30, 2004, she was diagnosed with cystitis and appeared to be in acute distress.  [Tr. 252, 257.]  By July 6, 2004, she was feeling better.  She had an abdominal hernia and had been living with it for months.  She needed surgery.  [Tr. 255.]

On July 12, 2004, Dr. Robison examined the hernia and recommended repair with mesh.  [Tr. 376.]  On July 22, 2004, the procedure was performed.  [Tr. 280.]

On August 25, 2004, Holder was seen for fibromyalgia.  She needed refills of her chronic medications, Ultracet, Flexoril and Effexor, because the last refills were "wrong."  She had had hernia surgery and was told her platelet count was high.  She was doing well, but her father was dying.  She

22

felt very anxious and was not sleeping.  Holder requested medications for anxiety.  The record notes a suicide attempt in 2001 for narcotic abuse.  She was on Effexor, Flexoril, Percocet and Ultracet on this date.  She was prescribed an anti-anxiety medication, Klonopin for 10 days and given Percocet (20), Flexoril (100), and Effexor (60).  [Tr. 253.]

On November 4, 2004, it appears that Holder requested more refills.  [Tr. 252.]  The following day, November 5, 2004, the record notes that she was there for new refills for back pain.  She was not taking Vioxx but was taking Celebrex.  She continued to have pain.  She was only getting partial refills each month which explained the "early" refill request.  [Tr. 249.]

A work activity report, dated November 24, 2004, states Holder worked at a bakery from October 2001 to September 15, 2002, but that she stopped because of a medical condition.  [Tr. 65-66.]  These dates may not be accurate.

On November 27, 2004, Holder filled out an adult disability function report.  [Tr. 57.]  She got up at 8 a.m. and lay on the couch until her back stopped hurting so that she was able to do some housework, including vacuuming, dishes, laundry, and grocery shopping.  She tended to lie on the couch, watch television and cook dinner.  She was in bed by 9 p.m.  She could not sit or stand for long periods.  She did not leave the house much.  The pain was intense after she remained in one position for too long.  She prepared meals that took about 3-4 hours.  She did household work for about 3-4 hours a day.  She went outside one to two times a week.  She could drive a car and shop for a few hours.  Her hobbies were reading, watching TV, crossword puzzles and crocheting.  She did not engage in any social activities.  Holder was able to pay attention for 30 minutes, was "excellent" at following instructions, and got along fine with authority figures.  Stress caused tension in her back and neck.  Fibromyalgia caused chronic pain and depression.  [Tr. 59-64.]

23

On December 20, 2004, Holder filled out another function report. [Tr. 92.] The report is similar to the November report. [Tr. 92.] A medication list from Pinon indicates Holder was taking Ultracet (1-2 every 4 hours); Percocet (1 every 6 hours), and Flexoril (3 times a day), among other medications. [Tr. 251.]

Holder's work history shows Holder worked as a baker in 2003 and as a truck driver from 1999 to 2001. [Tr. 84.] On December 24, 2004, Holder's daughter filled out a third-party function report. The daughter reported she spent five hours a day with her mother and lived in the same house. The daughter was 22 years old then. Her mother did light household cleaning, lay on a couch, watched TV and played games on the computer. [Tr. 76.] Holder did not have problems with her personal care. [Tr. 77.] She was able to prepare meals and usually prepared them four times a week. It took her all afternoon. She might clean all day long. [Tr. 78.] Holder did no yard work and did not drive often. She shopped by computer and paid bills. Holder was able to pay attention as long as she was not in severe pain. [Tr. 81.] The daughter did not observe any unusual behavior or fear in her mother, but said it was sad to watch her mother almost always in pain. [Tr. 83.]

**2005**

On January 5, 2005, Holder sought refills of Ultracet, Bextra and Flexoril through Pinon. [Tr. 355.] On January 21, 2005, there is a social security record indicating insufficient evidence to assess Holder's physical impairments. [Tr. 199.] On March 27, 2005, there is a psychiatric review technique form also stating there was insufficient evidence on or before the date of last insured (March 2002) to assess Holder's mental conditions. Thus, no diagnoses or impairments were assessed. [Tr. 201.]

On March 27, 2005, there is a San Juan Regional ER record indicating Holder had diagnoses of HTN, fibromyalgia, suicidal ideation, chemical and alcohol dependency.  Holder presented awake and tearful.  "Alcohol was on board."  [Tr. 507.]  She stated she ran out of Effexor a few days ago and was feeling very anxious.  She denied any plan to hurt herself that night.  She had not been sure she could wait to see Dr. Faherty in the morning when she had an appointment.  She had spoken to him earlier by telephone and the decision was left to her whether to be admitted.  Now she felt she could await her appointment.  She was medicated per Order with Ativan.  Depression and ETOH intoxication were noted on this record.  [Tr. 507.]

On March 28, 2005, she was seen at Pinon.  Depression was noted.  Her major "problem list" included "suicide 2001 NARC."  She presented for treatment of a major depressive disorder after months of treatment.  She was seen at the ER last night and given ½ tablet of Ativan and sent home.  Holder felt she had an anxiety attack and had been feeling more and more depressed.  She ran out of her medications a week ago and felt she no long could handle everything.  She was crying a lot and even feeling this way on Effexor.  [Tr. 246.]  The record indicates she was taking Percocet, Flexoril and Ultracet.  The medical provider explained the importance of the medications and staying on them.  The provider also discussed the side effects of Klonopin, which he gave Holder for 10 days.  Refills were made for Percocet (30) and Flexoril (100).  Annual medical refills were approved for all medications except Ultracet and Percocet.  Holder received a cortisone injection into her elbow.  [Tr. 248.]

On April 5, 2005, Holder filed a request for reconsideration of the underlying denial of her DIB application.  She stated she could not receive treatment for her fibromyalgia and related conditions from December 2001 to June 2002 because she was getting on her husband's insurance

plan and they had a pre-existing condition clause. "I have recently begun suffering a more severe depression and anxiety (panic attacks)." [Tr. 37.]

On April 11, 2005, Holder submitted a disability report appeal, in which she stated she had become more depressed. Her prescriptions had been increased. She had started to have panic attacks and could barely leave the house. These changes occurred since March 1, 2005, and the anxiety attacks began on March 29, 2005. She was taking Bextra and Ultracet for chronic pain and Flexoril for the same. She also was prescribed Effexor for pain and depression, a medication for high blood pressure and Albuterol for breathing. [Tr. 100-103.] She was still able to care for herself. [Tr. 104.]

On April 27, 2005, the notice for reconsideration was denied.

On May 25, 2005, Holder was barely breathing and in respiratory distress. She was transported to ER. [Tr. 505.] The chest x-ray showed no acute pulmonary process. [Tr. 363, 502.] She had bronchitis. She was given a nebulizer and Albuterol. [Tr. 499.]

On June 30, 2005, she was seen at Pinon with a respiratory infection. She was taking Percocet, Ultracet, Effexor, Flexoril and Klonopin. [Tr. 244.] The record indicates that Holder reported having quit smoking and that her breathing had worsened in May. She called 911 due to shortness of breath. At the hospital, she was placed on Prednisone, Advair, Albuterol. This medical note states "Quit Smoking!!!" She was prescribed Percocet (30). [Tr. 244.]

On July 22, 2005, Holder applied for an ALJ hearing, stating that she was disabled and entitled to benefits. [Tr. 34.] On an undated disability report appeal, Holder wrote that she had more trouble with depression and was staying at home in her pajamas. [Tr. 109.] Her medication list includes: Effexor (225 mg/day), Protonix (40 mg) for GERD, Thyroxine for low thyroid, HCTZ for HTN, Advair, Atrovent, Albuterol for COPD and asthma. [Tr. 118.] She had taken Seroquel for six

months and Oxycontin in 2005 for chronic pain, along with Percocet.  Holder was taking Xanaflex for muscle pain and spasms, Ativan for anxiety, and Flexoril for muscle pain.  [Tr. 118.]  The list was incomplete as Holder did not report that she was taking Ultracet (June 2005) and perhaps Trazadone (*see* Nov. 8, 2005 record, Tr. 223).

On July 22, 2005, Holder was seen at Pinon for chronic pain issues.  She presented because she was out of pain medication, having used those medications more often after Vioxx was taken off the market.  The medical care provider counseled her on losing weight and exercising.  He would not increase the Percocet or Ultram.  They would have to find other options but not higher doses or quantities of those medications.  Holder had GERD.  [Tr. 241.]

On July 31, 2005, Holder was seen at the ER for a supraglottic mass/laryngeal edema.  She had the sensation of a lump in her throat and increased pain with swallowing.  She had heartburn symptoms.  A history of narcotic addiction was noted along with obesity.  The records notes tobacco abuse and then "'quit' 5/05; however continues to take an occasional 'drag'".  [Tr. 283.]  The diagnoses included depression/anxiety with the last suicide attempt in 2001; she has had a total of 4, fibromyalgia, obesity, GERD, HTN, and RAD.[31]  [Tr. 283.]  She was taking Synthroid, Ultracet, Protonix, Percocet, Cataflam, Allegra, Hydrochlorothiazide, Effexor, Albuterol, and Atrovent.  She had a "distant history of drug use in the past."  She was somewhat anxious.  [Tr. 284, 481.]

On July 31, a CT scan of her neck was done because of a history of bronchitis.  The presence of an irregular soft tissue mass in the hypopharynx was observed, which might be secondary to infection or inflammation.  However, carcinoma could not be  excluded.  [Tr. 488.]  On August 2, 2005, a soft tissue neck test was performed that was inconclusive.  Because she was a smoker, further

---

[31]It is not clear what "RAD" is – reactive attachment disorder?

testing was required.  [Tr. 490.]  On August 3, an upper GI was performed.  GERD was diagnosed.  [Tr. 282, 362, 471.]

On August 3, 2005, she presented at Pinon for evaluation of her respiratory symptoms.  The record notes chronic reflux disease but that there was no evidence of a mass or other abnormality at this time.  When she went to the ER, she was given Ativan which helped her symptoms.  She stated she was feeling nervous at what she was facing.  The doctor noted they would continue to use pain medications for the underlying problems.[32]  She was prescribed Ultracet (120) and Percocet (40).  [Tr. 239.]

On August 5, 2005, she again went to Pinon for follow up after her visit to the ER.  The issue of concern was her plan for pain control which was then Percocet QID and Ultracet 2 QID and Flexoril 10 mg 1 TID.  Otherwise, she was "doing well" and not in any acute distress.  She was given refills on the medications at the doses she needed and referred for an endoscopy.  [Tr. 237-38.]

On August 23, 2005, she was given refills.  [Tr. 354.]  On August 30, 2005, Holder requested refills of her pain medications.  She currently was taking Ativan, Percocet, Flexoril, and Ultracet.  The doctor switched her to Oxycontin[33] for 3 days, then tapering to 1 pill twice a day.  She was to follow up by telephone in one week.  She was prescribed Percocet (120) and Oxycontin (60).  [Tr. 235.]

On September 7, 2005, Holder called Pinon.  She was taking 20 mg. Oxycontin a day and her Percocet use was 3 a day and might be 4 a day.  The plan was to reduce Percocet to 1 pill twice a day for one week and then one a day.  [Tr. 353.]  On September 13, 2005, Holder had a respiratory

---

[32]At Pinon, Holder was often treated by a Physician's Assistant.  She was also seen by doctors.

[33]" This medication is a strong narcotic pain reliever similar to morphine.  This medication is used to treat moderate to severe pain that is expected to last for a long period of time. It should be used on a regular schedule as prescribed by your doctor, not on an as-needed basis."  www.webmd.com

infection and cough.  The medical records states "Pain manage: down to 1-2 Percs a day !!!!"  The

health care provider started Seroquel.  The record notes: "pain mgt: 2 Oxycontin a.m. 3 Oxycontin

pm; 1-2 Perc. a day."  [Tr. 232.]

On September 26, 2005, Holder was admitted to the hospital for asthma, COPD, SOB, and

wheezing.  [Tr. 478.]  A chest x-ray showed no acute cardiopulmonary disease.  [Tr. 479.]

On October 3, 2005, Holder was seen again at Pinon after her hospitalization for bronchitis

and COPD.  She needed a refill of the medications that were started at the hospital, including refills

of the medications she used regularly.  She reassured the provider that she had quit smoking and that

there was no second-hand smoke in the house.  Her anxiety had improved but not much.  [Tr. 229.]

At first, she slept better when using Seroquel, but not as well now.  For pain management, Holder

requested 3 tablets in the a.m. and p.m.  She was breathing easily and her lungs were clear.  The

doctor increased the Oxycontin to 30 mg a.m. and p.m. and increased the Seroquel for anxiety

control.  [Tr. 230.]

On October 26, 2005, Holder was seen at Pinon.  She stated she had not been smoking for

three months.  She requested a 45 Percocets a month.  Flexoril was not helping and she was not

sleeping well.  She felt better on a higher dose of Seroquel but still was unable to sleep well.  The

notes indicate that they had just increased her Oxycontin and now she wanted more Percocet even

though she stated that the Oxycontin increase had been better for her.  "does not make sense.  She

only gets 40."  [Tr. 226.]

On November 8, 2005, Holder was seen at Pinon.  She requested refills of Oxycontin and

Percocet – "using Perco 1-2 times a day only !!!!" (it's not clear what the provider means by the

exclamation marks).  The provider increased the Seroquel and educated Holder on how Trazadone

could interact with Effexor.  She was to call for refills next month if she still was not sleeping well.  [Tr. 223.]

On November 18, 2005, she was seen at Four Corners GI Consultants for testing on November 21, 2005.  [Tr. 311, 374.]  On November 21, an esophagogastroduodenoscopy was performed to view the lesion better.  The record notes she "smokes occasionally now" but does not drink alcohol.  [Tr. 512.]  She was diagnosed with a benign gastric mucosa and esophagitis.  [Tr. 274, 512, 514.]

**2006**

The next medical record is dated April 3, 2006.  Holder was seen at Pinon for an evaluation of constant itching, welts, nausea, dry heaving, stress and headaches.  She restarted smoking due to stress.  She suffered from financial stress, and her house was close to being lost.  She was leaving town while her home was sold.  She wanted pain medications "early".  She requested Ativan for stress as she felt this high stress would be short term.  Her insurance company informed her it would no longer cover Effexor.  Her major problem list included: HTN, GERD, tobacco abuse, dyslipidemia, obesity, hypothyroidism, depression/anxiety, chronic pain, COPD, fibromyalgia, insomnia.  Her current medications were Zanaflex, Albuterol, Hydrochlorothiazide, Atrovent, Peak flow meter, Singulair, Allegra, Effexor, Advair, Protonix, Seroquel, Synthroid, Oxycontin, Oxycotin, Percocet.  The assessment was anxiety and uticaria.[34]  The doctor prescribed Ativan for the short term, but if she still needed medications after she was done with 45 pills, they would increase Seroquel.  [Tr. 221.]  She was advised to quit smoking again.  [Tr. 222.]

---

[34]Urticaria, or hives, is a condition in which red, itchy, and swollen areas appear on the skin -- usually as an allergic reaction from eating certain foods or taking certain medicines.

On April 12, 2006, Holder submitted a letter stating she was in the hospital five times last year and diagnosed with 2-3 new illnesses.  She was forced to sell her home.  She had four diseases that qualified her for disability.  She could not work some days and could not get out of bed.  [Tr. 27.]

On May 15, 2006, Holder was seen at Pinon for depression.  She presented for continuation of treatment of major depressive disorder after months of treatment.  She had been stable on Effexor for two years but her mother died last week, and Holder was forced to sell her house.  She needed more pain medications as her pain level was higher with her recent stress.  Percocet was refilled (30).  [Tr. 347-48.]

On May 30, 2006, Holder again requested refills from Pinon.  The doctor stated he was not going to refill the requests by phone.  She could see the provider on the next day.  She wanted refills of Percocet and Oxycontin.  [Tr. 344.]  On May 31, she was seen at Pinon.  Holder again requested refills of Oxycontin and Percocet for chronic pain.  She "takes these medications for severe fibromyalgia."  She was about one day early for her refills, "but she does normally check in monthly with Julie for med. refills.  Overall with medication, she is stable and can function."  She also presented for an upper respiratory infection and was acutely ill on this date.  [Tr. at 342-43.]

On June 2, 2006, she was improving.  She was to continue with Prednisone.  [Tr. 341.]  On June 12, 2006, Holder presented at the ER with knee pain.  She thought she had torn something when getting up from the floor.  She was unable to bear weight.  It appears that she was given some pain medications.  [Tr. 492.]  On June 13, 2006, Holder was seen at Pinon complaining that her right knee popped out yesterday.  The record shows a history of narcotic addiction.  She was taking Ativan, Percocet, Seroquel, Klonopin, Effexor, Oxycontin.  She was in much worse pain this morning than

when she was at the ER.  Her Percocet dosage was increased to 10 mg for now.  She was to see orthopedics.  [Tr. 338-340.]

On June 15, 2006, Holder was seen at Orthopedic Associates for an evaluation of her right knee pain.  The x-ray was normal, but there was evidence of a subacute lateral meniscus tear.  An MRI was needed.  [Tr. 320.]  On June 19, 2006, the MRI showed a definite locked lateral meniscus tear.  The record notes her maximum body weight had been 330 pounds although she now weighed 215 pounds.  She had quit smoking but had restarted at less than ½ pack a day.  Holder also had an infected tooth that day.  [Tr. 321.]

On June 26, 2006, Holder was seen at Pinon for jaw pain.  She had to cancel her knee surgery scheduled for the following day until the tooth infection cleared up.  She wanted refills of Motrin, Zanaflex, Percocet, Oxycontin, and Seroquel.  The medications were refilled as requested.  She was to go back to four Zanaflex a day after one month.  "Dr. Gurard would handle post operative pain as the patient wanted higher Percocet dosing for post op pain."  [Tr. 335-36.]

On July 6, 2006, a chest x-ray indicated her heart was normal but a July 9, 2006 x-ray indicated prominence of the ascending aorta.  [Tr. 468, 470.]

On July 11, 2006, Holder was admitted at the ER for asthma exacerbation.  She had COPD and asthma and had suffered from four weeks of increasing shortness of breath.  She was to have a knee operation on the next day and was very upset knowing she would have to cancel it now.  The knee was causing her significant pain and yet with her worsening pulmonary status, she would not be able to proceed.  She requested Ativan.  The record notes a history of depression, anxiety, fibromyalgia, hypothyroidism, narcotic addiction, obesity, dyslipidemia, tobacco abuse (and continues to smoke), GERD, HTN, COPD, and asthma.  The medications prior to admission were Seroquel,

Oxycontin, Percocet, Synthroid, Effexor, Klonopin, Protonix, Advair, Albuterol, Allegra, Singulair, Atrovent, Hydrochlorothiazide, Zanaflex, Ibuprofen and Ativan.  She was very anxious.  Since anxiety was contributing to her symptoms, she was given Ativan for P.R.N. use.  [Tr. 464]

On July 19, 2006, she was seen again at Pinon.  She was feeling better with respect to the wheezing, but her anxiety was worse.  She had had "a lot on her plate" with the deaths of both parents.  She wondered if there was anything the doctor could add to the Effexor that might help.  Ativan seemed to keep things calm for her.  She took Seroquel regularly.  She needed a refill of Percocet for the upcoming knee surgery.  Holder's prescriptions were refilled.  She was to use Ativan on a PRN basis and start weaning off it when she was able.  A CT scan was ordered to examine the ascending aortic prominence.  [Tr. 331.]

On July 22, 2006, the CT of the thorax showed no embolism or mass.  [Tr. 469.]

On August 3, 2006, Holder called requesting a refill of Percocet.  The staff member indicated it already had been refilled on July 19, and questioned the doctor whether he wanted to refill it now.  [Tr. 330.]  The doctor allowed the refill but told his staff that Holder was to be reminded in the future that she would need an appointment to refill this type of medication.

On August 4, 2006, Holder was 10 days "post op" from her knee surgery and doing "extremely well."  The doctor thought she would do best by having some physical therapy because of the damage and atrophy.  She wanted to go to Health South.  A prescription for Lortab was refilled.  [Tr. 322.]

On September 5, 2006, Holder's non-attorney representative wrote the ALJ and submitted additional evidence.  In the letter, the representative argued that Holder's "mood disorder" was the most limiting impairment and that drug abuse and alcoholism were not a factor material to disability.

While Holder had used prescription medications to self medicate there was no evidence that her condition would improve absent the abuse of the medications.  [Tr. 314.]

On October 18, 2006, Judge Reyes held the ALJ hearing in Farmington, at which Holder was represented by a non-attorney.  [Tr. 529.]  There was no residual functional capacity information in the record.  [Tr. 533.]  No vocational expert was present to testify.

On November 1, 2006, Holder appeared at the ER with shortness of breath and asthma.  She was very anxious and given Ativan.  She was admitted and not discharged until November 6th.  [Tr. 523-25.]  She was intubated.  They also had to extubate her because she did not tolerate the ventilator well.  Holder was given aggressive pulmonary treatments for 48 hours and slowly improved.  "One of the issues that came up during hospitalization was that of narcotic addiction and dependence. Family had talked to Dr. Cumberworth about her abuse of medications.  She did not receive any narcotic medications while in ICU on the floor and has done fairly well without them.  Social work has talked to her about options and will try to get her an appointment with Dr. Hatchidorian for some possible biofeedback regarding dealing with stress, anxiety and controlling her breathing."  [Tr. 523.]

A November 1, 2006 hospital record indicates "significant abuse of prescription medications." [Tr. 527, 528.]

On December 9, 2006, Judge Reyes issued an unfavorable decision denying DIB benefits.  He stated, *inter alia*, that "given the claimant's long history of prescription drug abuse, it is difficult to determine whether she is seeking medical treatment due to musculoskeletal pain or in order to obtain narcotics."  [Tr. 24.]  In any event, the ALJ concluded that Holder did not have any severe emotional or mental impairments at step 2 of the analysis.  She was given an RFC to do light exertional work

[Tr. 25] but was unable to perform her past relevant work.  [Tr. 25.]  In applying the grids, Judge Reyes determined that Holder was not disabled at step five.

**2007**

On February 26, 2007, Holder again presented at the ER with asthma and shortness of breath. She was given Ativan.  [Tr. 521.]  On June 6, 2007, the Appeals Council denied her request for review.  [Tr. 7.]

**Analysis**

Holder argues that the ALJ's step two determination that she did not suffer from "severe" depression is not supported by substantial evidence.  The Court disagrees.

## I.    STEP TWO FINDINGS

At step two of the sequential evaluation process, the decision maker decides whether the claimant "has a medically severe impairment or combination of impairments."  Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).  Plaintiff bears the burden to present medical evidence of a severe impairment.  Id. at 751.  "A severe impairment is one that interferes with basic work activities."  Roberts v. Callahan, 971 F. Supp. 498, 500 (D.N.M. 1997).  The mere presence of a condition is not sufficient to make a step two showing of severity.  Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir.2003).

For example, an impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, hearing, seeing, speaking, understanding, carrying out simple instructions, use of judgment, responding appropriately to supervision and co-workers, and dealing with changes in a routine work

setting.  20 C.F.R. § 404.1521(b)(1-6).  An impairment is not severe if it is only a slight abnormality

with a minimal effect on the ability to work.  Roberts, 971 F. Supp. at 500 (*citing* SSR 85-28).

> Presumptively, if the medical severity of a claimant's impairments is so slight that the
> impairments could not interfere with or have a serious impact on the claimant's ability
> to do basic work activities, irrespective of vocational factors, the impairments do not
> prevent the claimant from engaging in a substantial gainful activity. If the claimant is
> unable to show that his impairments would have more than a minimal effect on his
> ability to do basic work activities, he is not eligible for disability benefits.  If, on the
> other hand, the claimant presents medical evidence and makes the *de minimis* showing
> of medical severity, the decision maker proceeds to step three.

Williams, at 751 (*citing* Bowen v. Yuckert, 482 U.S. 137, 140 (1987)).

 Thus, under applicable law, Holder must make only a *de minimis* showing at step two that

her mental impairments were severe.  Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir.1997).  *See also*

Langley v. Barnhart, 373 F.3d 1116, 1123 (10th Cir. 2004) ( "[o]nly those claimants with slight

abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without

undertaking" the subsequent steps of the sequential evaluation process) (internal citation omitted)..

In the Commissioner's response brief, he argues that it is beyond dispute that Holder exhibited

significant mental symptoms in December 2001 when she was hospitalized for a suicide attempt and

overdose.  [Doc. 16, p. 5.]  However, according to the Commissioner, an examination of the medical

record indicates that Holder's mental status "was generally under control with proper medication

management" after December 2001.  [Id.]

First, the Court questions, based on the record, whether Holder received proper medication

management or any management at all.  Her  medical providers consistently prescribed her high and

repeated dosages and quantities of prescription pain killers, anti-anxiety medications, and anti-

depressants, notwithstanding her history of suicide attempts, depression and drug addiction.  Based

on the medical  records and treatment, it is difficult to fathom how Holder's physical or mental status

could ever be described as "reasonably controlled."  Instead, there is every indication that no health care provider was able to control her addiction.[35]

The Court will not re-examine the entire medical record since it was summarized in great detail above.  However, the Court notes that Holder was prescribed anti-depressant medications as early as 1995.  She was still taking various anti-depressant medications as late as 2006, along with anti-anxiety medications.  She was given diagnoses of depression and anxiety on multiple occasions. [Tr. 220.]  Her anti-depressant and anti-anxiety medications were adjusted many times, as late as April 2006.  [Tr. 221.]  On April 15, 2006, her primary care provider diagnosed her with depression and noted that she had presented for "continuation treatment of major depressive disorder after months of treatment."  [Tr. 347-49.]  As of that date, Holder reported she had tried the anti-depressants Prozac, Paxil, Wellbutrin, Zoloft and Depakote without much help.  [Tr. 346.]  In 2006, Holder continually asked for more narcotic pain and anti-anxiety medications and successfully and repeatedly obtained them.  [Tr. 335, 336, 344, 347, 220.]

In July 2006, hospital records document Holder's history of depression and anxiety.  She wondered whether any medication could be added to Effexor to provide more help.  She was described as "very labile and tearful."  [Tr. 331.]  Her medications were adjusted again.  Some of the 2006 medication list evidences a severe mental condition and indicates that her condition was not under control:  Medrol, Oxycontin (20 mg), Oxycontin (10 mg), Effexor, Hydrocholorothiazide,

---

[35]At the ALJ hearing, Holder's representative and the ALJ discussed Holder's DIB application in terms of the date she was last insured – March 31, 2002.  [Tr. 535.]  Holder's representative stated that he was hoping to persuade the ALJ that Holder became disabled before the date of last insured.  He further argued that March 31, 2002 was "an important date in this hearing, and that if the ALJ determined Holder was disabled during the earlier time period, the ALJ would have to decide if the disability continued to the present."  [Tr. 538, 544.]  In the ALJ's written decision, he stated that her earnings record demonstrated that she had acquired sufficient quarters to remain insured through December 31, 2007.  Thus, his decision examined whether Holder was under a disability from the date of onset through the date of his opinion.  [Tr. 19.]

Seroquel, Synthroid, Albuterol, Protonix, Advair, Allegra, Singulair, Atrovent, Percocet, Flexeril, Ativan, Albuterol, Ibuprofen.  [Tr. 373.]

As of November 2006, Holder's family continued to talk to medical providers about Holder's active narcotic addiction, dependence and abuse of medications.  [Tr. 523.]

In 2005, Holder presented to the hospital with significant anxiety and some suicidal ideation, although she denied planning to hurt herself.  Depression and alcohol intoxication were noted.  [Tr. 507.]  In March 2005, Holder saw her doctor for "continued treatment of major depressive disorder after months of treatment."  She was feeling more and more depressed then and felt she was having anxiety attacks.  She was diagnosed with major depressive disorder and anxiety, and her medications were adjusted yet again.  [Tr. 246.]

Holder's medical records consistently note diagnoses related to depression, anxiety and possible other conditions, including bipolar disorder and questions about other personality disorders.

The Court concludes, therefore, that Holder's mental impairments at step two of the analysis were not merely "slight abnormalities."  Rather, there is significant objective medical evidence in the record addressing Holder's mental impairments.  Thus, the Court finds that substantial evidence does not support the ALJ's finding at step two that Holder's mental impairments were not severe.  In so finding, the Court recognizes that Holder's abuse of prescription narcotics forms a significant portion of her problems.  However, the Court's concern is that her mental condition and impairments have not been adequately addressed by the ALJ.

## II.   OBESITY ANALYSIS

The Commissioner argues that the ALJ properly considered the limiting effects of Holder's impairments, including any possible limitations posed by Holder's excessive weight.  However, the

Commissioner also concedes that the ALJ did not specifically discuss obesity. [Doc. 16, p. 8.] Holder argues that the ALJ should have evaluated her obesity in accordance with SSR 02-1p.

The ALJ did not discuss whether Holder's obesity was a severe or non-severe impairment at step two of the analysis. Yet, the record is replete with references to Holder's obesity. Because the Court is remanding for a new ALJ hearing, to determine the extent, if any, that Holder's mental impairment(s) may limit her basic work activity, the ALJ is directed to consider Holder's obesity in his five-step analysis, and to apply the appropriate medical criteria in evaluating her obesity.

## III.   **APPLICATION OF GRIDS**

Because of the remand, the Court need not address Holder's remaining arguments concerning the ALJ's exclusive reliance on the grids. If, at step two of the analysis, Holder is found to have severe emotional impairments, it is generally inappropriate to exclusively rely on the grids at step five for a finding of non-disability.

The ALJ is advised that under circumstances where a finding of severity is made at step two regarding a mental impairment, he may need to call a vocational expert to testify at the hearing. The presence of a nonexertional impairment, such as severe psychological limitations, typically preclude exclusive resort to the grids. Trimiar v. Sullivan, 966 F.2d 1326, 1333 (10th Cir. 1992); Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991).

In addition, the Court notes that at step two, the ALJ determined that Holder's chronic back pain was a severe impairment. On remand, the ALJ may need to address any credible allegations of pain in accordance with the framework set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987).

Further, the Court observes that there were no functional or mental RFC's completed in this case. Upon remand, the ALJ may consider whether RFC's are helpful in reaching a determination

on the DIB application.  The ALJ should also determine whether to order a consultative examination. While the Commissioner is given broad latitude in deciding whether to order such an examination, Diaz v. Sec'y of HHS, 898 F.2d 774, 778 (10th Cir. 1990), the evidence in this case raises many questions regarding what limitations Holder actually has.  Such examination is necessary when the record evidence "establishes a reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability."  Hawkins v. Chater, 113 F.3d 1162, 1169 (10th Cir. 1997).

## IV.   **DA&A ANALYSIS**

The ALJ did not conduct a DA&A analysis in this case.  Instead, he concluded at step two that one of Holder's severe impairments was prescription drug abuse.  [Tr. 21.]  The proper procedure would have been for the ALJ to first determine whether Holder was under a disability. Then, if Holder was found disabled, the ALJ should have determined whether Holder's physical and mental limitations would remain if she stopped using drugs or alcohol.  In other words, the ALJ decides whether her drug addiction or alcoholism is a contributing factor material to the determination of disability.  20 C.F.R. § 404.1435.

The Court is empathetic with the ALJ's comment that given Holder's "long history of prescription drug abuse, it is difficult to determine whether she is seeking medical treatment due to musculoskeletal pain or in order to obtain narcotics."  [Tr. 24.]  The Court has the same questions. But, neither the ALJ nor the Court is in the position to make that type of medical determination.  That is the province of a medical expert or consultant.

Finally, while the Court determines that remand is necessary in this case, the Court's decision should not be construed to mean that Holder is disabled and entitled to DIB benefits.  The Court is

concerned both with the medical provider's management of Holder's condition and Holder's manipulation and management of the medical system.  It is not at all clear, based on the record evidence, whether Holder is under a disability and entitled to DIB benefits.  However, the Court determines that a remand is proper because substantial evidence did not support all of the ALJ's step two findings.

IT IS THEREFORE ORDERED that Holder's Motion to Remand is GRANTED and this case is remanded for additional proceedings so that the ALJ can address the matters described herein.


_____
Lorenzo F. Garcia
Chief United States Magistrate Judge

41